IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROCHELLE BURKS, TERRY BENSON,<br>RHONDA FAWRA, AMBER FIELDS,<br>GWENZELLA PENNEWELL, and<br>ROCHELLE, TUCKER, WILLIAM PENNEWELL | )<br>)<br>)<br>) | |
| | ) | C.A. No. 04-0165 (KAJ) |
| Plaintiffs, | )<br>) | |
| | ) | Trial By Jury Demanded |
| v. | )<br>) | |
| JAMES HOBAN, CRAIG WELDON, ROBERT<br>ROWE, ROGER JACKSON, ROBERT<br>WILLOUGHBY, MARK LUTES, JASON WILSON<br>DESHAWN PRICE, CHARLES TWARDORSKI,<br>BRENT SNYDER, PHILLIP DAVIS, JAMES<br>HEDRICK, SUE RIMMEL, PROPERTY ADVISORY<br>GROUP, INC, and NEW CASTLE COUNTY | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| Defendants. | )<br>) | |

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS', PROPERTY ADVISORY GROUP AND SUE RIMMEL'S MOTION TO DISMISS

GARY W. ABER (DSB #754)
Aber, Goldlust, Baker & Over
702 King Street, Suite 600
P.O. Box 1675
Wilmington, DE 19899
(302) 472-4900
Attorney for Plaintiffs

DATED: May 9, 2005

# TABLE OF CONTENTS

Page No.

TABLE OF CITATIONS                                                                 3

STATEMENT OF RELEVANT FACTS                                                        6

ARGUMENT

I.      THE APPLICABLE STANDARD ON A MOTION
        TO DISMISS PURSUANT TO RULE 12(b)(6).                                      9

II.     THIS COURT HAS JURISDICTION OF THIS MATTER
        PURSUANT TO 42 U.S.C. §1985(3), SINCE THE MOVING
        DEFENDANTS ACTED IN CONCERT WITH THE STATE
        DEFENDANTS.                                                               10

        A.      The Statute                                                       11

        B.      State Action                                                      12

III.    THE MOVING DEFENDANT'S VIOLATED THE
        PLAINTIFFS' RIGHT OF PRIVACY UNDER THE
        DELAWARE LANDLORD AN TENANT STATUTE                                       17

CONCLUSION                                                                        19

# TABLE OF CITATIONS

**Page No.**

*Abbott v. Latshaw*
    *164 F.3d 141, 147-148 (3d Cir. 1998)*                     13

*Adickes v. S.H. Cress & Co*
    *398 U.S. 144, 152, 90 S.Ct. 1598*
    *26 L.Ed. 142 (1970)*                     14

*Agere Systems Guarding Corp. v. Proxim, Inc.*
    *190 F.Supp.2d 726 (D.Del. 2002)*                9

*Baker v. Smith & Wesson Corp.*
    *2002 WL 31741522 (Del.Super. 2002)*             18

*Brown v. Phillip Morris, Inc.*
    *250 F.3d 798, 807 (3d Cir. 2001)*                9, 11

*Burnett v. Grattan*
    *368 U.S. 42, 55, 105 S.Ct. 2924*
    *82 L.Ed.2d 36 (1984)*                   11

*Cooper v. Parish*
    *203 F.3d 937, 952 n.2 (6th Cir. 2000)*            14

*Dennis v. Sparks*
    *449 U.S. 24, 27, 101 S.Ct. 183*
    *66 L.Ed.2d 185 (1980)*                  14

*Does v. Delie*
    *257 F.3d 309, 131 (3d Cir. 2001)*                9

*Dohner v. Neff,*
    *240 F.Supp.2d 692 (N.D. Ohio2002)*            13, 14

*Great Am.Fed.Sav. & Loan, Assn. v. Novotny*
    *442 U.S. 366, 376, 99S.Ct. 2345*
    *60 L.Ed.2d 957 (1979)*                 11

*Griffin v. Breckenridge*
    403 U.S. 88, 97, S.Ct. 1790
    29 L.Ed.2d 1338 (1971).              11, 12,13, 15
                              16

*Hampton v. Hanrahn*
    600 F.2d 600, 620-21 (7th Cir. 1979)          11

*Hernandez v. Joliet Police Department*
    197 F.3d 254, 263 (7th cir. 1999)          11

*Hodgson v. Superior Court in and For New Castle County*
    239 A.2d 222 (Del.Supr. 1968)          18

*Hurst v. City of Rehoboth Beach*
    2005 WL 823867 (D.Del. 2005)          11, 13

*Lloyd v. Jefferson*
    53 F.Supp.2d 643, 670 (D.Del. 1999)          12

*Oran v. Stafford*
    226 F.3d 275, 279 (3d Cir. 2000)          9

*Mark v. Borough of Hatboro*
    51 F.3d 1157 (3d Cir. 1995)          16

*Marshall v. Lauriault*
    372 F.3d 175, 185 (3d Cir. 2004)          9

*Martin v. Delaware School of Law, Widener University*
    625 F.Supp. 1288 (D.Del. 1985)          9

*Mason v. General Foods Corporation*
    191 WL 255368 (D.Del. 1991, at n.1)          9

*Matland v. U.S.*
    25 F.2d 752, 753 (3d Cir. 1961)          18

*McKeesport Hosp. v. Accreditation Council for Graduate Med.Edu.*
    24 F.3d 519, 524 (3d Cir. 1994)          13, 16

*Nanya-Nasshut Ex. Rel. Hand v. Centex Home Equity Corp.*
    2002 WL 22871667 (E.D.Pa. 2003)          15

*Payton v. New York*
    445 U.S. 573, 585, 100 S.Ct. 1371
    36 L.Ed.2d 639 (1980)          17

*Petition of Horsey,*
    *545 A.2d 629 (Del.Supr. 1988)*                                    17

*Rigsby v. Tyre*
    *380 A.2d 1371 (Del.Super. 1977)*                                  18

*Trump Hotels & Casino Resorts v. Mirage Resorts, Inc.*
    *140 F.3d 478, 483 (3d Cir. 1998)*                                  9

*United Brotherhood of Carpenters and Joiners of America, Local*
*610, ALF-CIO v. Scott*
    *463 U.S. 825, 103 S.Ct. 3352*
    *77 L.Ed.2d 1049 (1983)*                                           13

*United States v. Martinez-Fuerte*
    *428 U.S. 543, 531, 96 S.Ct. 3074*
    *49 L.Ed.2d 1116 (1976)*                                          17

## STATEMENT OF RELEVANT FACTS

The plaintiffs in this matter are all residents of the same apartment complex in New Castle County, Lexington Green Apartments (¶¶ 1 through 7)[1]  All of the complainants, except for William Pennewell, are African American females and have historically been subjected to racial discrimination (¶86).  [2]

The defendant, Property Advisory Group, Inc. managed the apartment complex, Lexington Green Apartments, where the plaintiffs lived (¶92).  The defendant, Sue Rimmel was an employee of Property Advisory Group (¶20), with the responsibility for managing the complex and maintaining the records of all tenants of Lexington Green Apartments (¶92).  The remaining individual defendants are either police officers employed by New Castle County, or are probation officers employed by the State of Delaware in the Department of Probation and Parole.

In late June or early July of 2003, one of the defendants, James Hoban, a New Castle County police officer, obtained from the defendant, Sue Rimmel, a list of all tenants residing in Lexington Green Apartments (¶25).  The defendant Rimmel provided that list to the New Castle County defendants without any legal process, and without a warrant (¶4), contrary to the custom and practice with in this state of maintaining such matters as confidential (¶93), and without providing the plaintiffs any prior notice or opportunity to protect from disclosure of such information (¶95).  The defendant, Hoban, then crossed referenced that list of tenants with the Delaware Degis Computer System to determine if any of the residents were on probation or had outstanding capiases or warrants applicable to them (¶25).  The resulting searches were not

---

[1] Since this proceedings are based upon the defendants' motion to dismiss, all facts are taken as pleaded from the complaint. References are to paragraphs in the complaint.
[2] No claim is asserted on behalf of Mr. Pennewell against the moving defendants.

conducted for the purpose of arresting or placing into custody any of the tenants (¶29), but rather for "intelligence gathering".

Thereafter, the defendant Hoban sought to obtain search warrants from a Magistrate Court of the State of Delaware, to search the apartments of the plaintiffs, located in Lexington Green Apartments. The Magistrate denied the request, finding a lack of probable cause for the issuance of such warrants (¶27). In order to evade the necessity of a warrant, the defendant Hoban, after consulting with his superiors, approached the Department of Probation and Parole to utilize their administrative authority to conduct the desired searches (¶28).

Thereafter, the County and State defendants without the use of a search warrant obtained from the defendant Sue Rimmel/Property Group, Inc. the keys to the apartments leased to the plaintiffs (¶88). The defendant Rimmel provided the keys to the residences of the plaintiffs, without the knowledge or permission of the plaintiffs (¶31).

On July 2, 2003, between the hours of 6:00 a.m. and 7:00 a.m., the County and State defendants, using the keys given to them by the defendant Rimmel, as managing agent of the apartments owned and operated by Property Advisory Group, gained access to and searched the apartments of the plaintiffs, without warrants, without probable cause or reasonable suspicion to believe that any actual ongoing criminal activity was occurring (¶23).

Of the apartments searched, several of the apartments were leased to individuals that had neither capiases issued for them, nor arrest warrants, nor were they on probation. For instance, the plaintiff Benson had no capias issued for her nor was she on probation (¶37). Likewise, the apartment of the plaintiff, Pennewell was searched and ransacked, while she was not present, even though only she, and three minor children resided in the apartment (¶¶65 and 66). During

7

the searches, the County and State defendants used keys obtained from the defendants Property

Advisory Group/Sue Rimmel to open the doors of the various apartments (¶¶36, 44 and 72).

After the doors were opened, the search of the apartments were conducted and some of

the plaintiffs were not allowed to get dressed, and were forced to stand in front of County and/or

State defendants in a state of undress, being clothed only in their underwear (¶45).

## ARGUMENT

### I.    THE APPLICABLE STANDARD ON A MOTION TO DISMISS PURSUANT TO RULE 12(b)(6).

A motion to dismiss pursuant to Fed.R.Civ.P 12(b)(6) should be granted only if it is clear that no relief can be granted under any set of facts that can proved consistent with the allegations in the complaint, *Doe v. Delie, 257 F.3d 309, 313 (3d Cir. 2001).* In such a situation, a complaint should be dismissed only if, and after accepting as true all the facts as alleged in the complaint, and drawing all reasonable inferences from those facts in favor of the plaintiff, it appears beyond a doubt that the plaintiff can prove no set of facts to support a claim that would warrant relief. *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483(3d Cir. 1998), Oran v. Stafford, 226 F.3d 275, 279 (3d Cir. 2000).* A court should grant a motion to dismiss only if it is convinced that under no set of facts could it grant relief. *Marshall v. Lauriault, 372 F.3d 175, 185 (3d Cir. 2004); Brown v. Phillip Morris, Inc., 250 F.3d 798, 807 (3d Cir. 2001); Trump Hotels, supra.*

This District Court has previously held that, in the face of a motion to dismiss, that a better course of action, if necessary to liberally allow amendments that might then state a proper claim and to defer judgment on the motion to dismiss. *Agere Systems Guarding Corp. v. Proxim, Inc., 190 F.Supp.2d 726 (D.Del. 2002), Martin v. Delaware School of Law, Widener University, 625 F.Supp. 1288 (D.Del. 1985).* Previously this Court has followed a procedure of allowing discovery in connection with an opportunity to amend a complaint, and then revisiting the motion to dismiss. *Mason v. General Foods Corporation, 191 WL 255368 (D.Del. 1991, at n.1).*

## II.   THIS COURT HAS JURISDICTION OF THIS MATTER PURSUANT TO 42 U.S.C. §1985(3), SINCE THE MOVING DEFENDANTS ACTED I CONCERT WITH THE STATE DEFENDANTS.

This action, with regards to moving defendants, Sue Rimmel and Property Advisory Group, Inc., is brought pursuant to the provisions of *42 U.S.C. §1985(3)* alleging a conspiracy between those defendants, and certain police officers of New Castle County and Probation and Parole officers of the State of Delaware, to commit searches and seizures of the plaintiffs in violation of their rights under the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

More specifically, it is generally alleged in the complaint, that those defendants acted in concert to permit the officers to enter the apartments leased by the plaintiffs from the moving defendants, Rimmel and Property Advisory Group, without probable cause, without warrants, and, not for the purposes of apprehending the plaintiffs for any criminal activity. Specifically, without any justification the moving defendants not only provided the State defendants with a complete list of all of the tenants of the apartment complex in question, Lexington Green Apartments, but also agreed to provide to the State defendants keys to the plaintiff's apartments so that the State defendants could enter those apartments unannounced.[3]   The applicable provisions of *42 U.S.C. §1985(3)* provide as follows:

> "If two or more persons in any state or territory conspire...for the purpose of depriving either directly or indirectly, any person or class of persons of the equal protections of the laws or the equal privileges and immunities under the laws...(and) in any case of conspiracy set forth in this section, if one or more persons engage therein do, or cause to be done any act in furtherance of the object of such conspiracy, whereby another is injured in its person or property or deprived of having and exercising any right or privilege of a citizen of the United

---

[3] This later fact, the providing of keys to the plaintiffs' apartments went completely unmentioned in the defendants' opening memorandum.

States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation against any one or more of the conspirators." *42 U.S.C. §1985(3).*

**A. The Statute:** That statute does not itself create any substantive right, but rather serves only as a vehicle for vindicating federal rights which have been violated by conspiracy, which rights have been defined elsewhere. *Great Am. Fed.Sav. & Loan, Assn. v. Novotny, 442 U.S. 366, 376, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979); Brown v. Phillip Morris, Inc., 250 F.3d 789 (3d Cir. 2001).* The statute is considered a remedial statute, and thus strives to give victims the opportunity to sue for relief. *Burnett v. Grattan, 368 U.S. 42, 55, 105 S.Ct. 2924, 82 L.Ed.2d 36 (1984).* In view of the fact that the statute is remedial, the statute should be interpreted so as to have "...a sweep as broad as (its) language..." *Griffin v. Breclkenridge,403 U.S. 88, 97, 91 S.Ct. 1790, 29 L.Ed.2d 1338 (1971).*

The first requirement, in order to find a violation of the statute, is that there must have been a conspiracy. A civil conspiracy exists when two or more persons act in concert to commit an unlawful act. *Hurst v. City of Rehoboth Beach, 2005 WL 823867 (D.Del. 2005)*(citing: *Hampton v. Hanrahn, 600 F.2d 600, 620-21 (7th Cir. 1979) Rev'd in part on other grounds, 446 U.S. 754 1980, aff'd, 502 U.S. 21(1991))*(a copy of which is attached hereto as Exhibit No. 1). [4]

There need not be a formal agreement to find a conspiracy. An agreement between the alleged co-conspirators may be inferred from the circumstantial evidence if there is sufficient evidence for which a reasonable jury could find there was an understanding between the parties to achieve the conspiracy's objective. *Hernandez v. Joliet Police Department, 197 F.3d 254, 263 (7th Cir. 1999).* In this case it is clear that a reasonable jury could find that the moving

---

[4] The defendants motion to dismiss filed in this matter does not raise the issue of the existence or non-existence of a conspiracy. However, that issue is discussed herein for the sake of completeness.

defendants, Rimmel and Property Advisory Group, conspired with the state and county defendants to violate the rights the plaintiffs had to be secure in their residences. Even if the defendants had some unknown basis for giving the county and state defendants the tenant list of all the tenants living in Lexington Green Apartments, including the plaintiffs' names, there can be no excuse or no rationale which would authorize the moving defendants to give keys to the state and county defendants without a court order, or a warrant. The naked request by the county and state defendants for the keys would be an insufficient reason for a landlord to give the keys to such officials which would allow them to enter the plaintiffs' residences, unannounced, at 6:00 a.m. in the morning.

     **B.**    <u>State Action</u>: As early as 1971, the Supreme Court held that it was evident that all the indicators of the statute, including the statute's text and legislative history, point "unwaveringly" to the fact that *§1985(3)* provides coverage for a private conspiracy. *Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)*. The limitation the Court placed upon such protection was that it required some racial or other class based invidious discrimination.

> "The constitutional shoals that would lie in the path of interpreting
> *§1985(3)* as a general federal tort law can be avoided by giving full
> effect to the congressional purpose - - by requiring, as an element of
> the cause of action, the kind of invidiously discriminatory motivation
> stressed by the sponsors of the limiting amendment...(This) means that
> there must be some racial or perhaps otherwise class-based invidious
> discriminatory animus behind the conspirator's action." *Griffin v.
> Breckenridge, 403 U.S. at, 102*.

    The complaint in this matter alleges that the plaintiffs were both members of a racial minority, as African Americans, and were also females (¶86).[5]

---

[5] Women have been recognized as a cognizable class for purposes of *42 U.S.C. §1985(3), Lloyd v. Jefferson, 53 F.Supp.2d 643, 670 (D.Del. 1999)*.

If it is argued that intelligence gathering or the conducting of a "criminal sweeps" is solely a state function, then *Griffin v. Breckenridge* was later clarified in *United Brotherhood of Carpenters and Joiners of America, Local 610, AFL-CIO v. Scott, 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983)*. There is was held that where the rights, privileges, and immunities that are sought to be vindicated are those which can be restrained only by official action, then it is necessary to prove "...that the state was somehow involved in or affected by the conspiracy." *United Brotherhood, 463 U.S. at 833*, holding it must be shown the alleged conspirator was a state actor.

If state action is a requirement in the present fact situation, then it is generally recognized that a private party who willfully participates in joint actions with state officials to deprive a person of a constitutional right, becomes themselves a state actor, *Abbott v. Latshaw, 164 F.3d 141, 147-148 (3d Cir. 1998)*(finding that the ex-wife who obtained the assistance of police officers to improperly attempt to repossess a motor vehicle acted "under color of law"). That is:

> "State action may be found if the private party has acted with the help of, or **in concert with state officials**. *McKeesport Hosp. v. Accreditation Council for Graduate Med. Edc., 24 F.3d 519, 524 (3d Cir. 1994)* (Finding no state action in that the delegation of accreditation of a medical school was not a traditional or exclusive state function); cited with approval *Hurst v. City of Rehoboth Beach 205 WL 823867 (D.Del. 2005)* (finding no state action where the plaintiff called the police, and the private party's telephone call to 911 required the police to respond) (Emphasis Added)

In *Dohner v. Neff, 240 F.Supp.2d 692 (N.D. Ohio, 2002)*, a private individual was found to be "...acting under color of state law" *Id. at 699*, where they worked in conjunction with a state employer to constructively discharge the plaintiff. In determining whether or not the private individual was acting under color of law, the Court held that such a finding:

> "Does not necessarily require that the defendant be a state officer or employee: 'It is enough that [the private person] is a willful participant in a joint action with the state or its agents. Private persons, jointly

13

engaged with state officials in the challenged action, are 'under color'
of law for purposes of *§1985(3)* actions (internal citations omitted)."
*Dohner v. Neff, supra, at 699.* (Holding that a private individual could be
found to violate *42 U.S.C. §1985(3)*, when they were acting jointly with
a state employer to obtain the termination of the plaintiff's employment).

Thus, to act under color of "State Law" does not require an individual to be an officer of

the state. It is enough that he is a willful participant in a joint action with the state or its agents.

Therefore private persons jointly engaged with state officials in challenged actions are acting

under color of law. *Dennis v. Sparks, 449 U.S. 24, 27, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980).* In

*Adickes v. S.H. Cress & Co., 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.142 (1970)*, the court

held that where a store employee agreed with police officers to deny service to an individual

based upon race, the store employee's actions became a state action. See also *Cooper v. Parish,*

*203 F.3d 937, 952 n. 2 (6th Cir. 2000)*(Holding that where a private party has conspired with

state officials to violate constitutional rights, then that party qualifies as a state actor, and may be

held liable pursuant to *§1985(3)*).

In this case, discovery might well disclose a close involvement between the moving

defendants, Rimmel and Property Advisory Group, with the State and County defendants. At

this stage, the plaintiffs have no way of knowing which party initiated the contact or which party

suggested the "sweep" of the plaintiffs' apartments. It is foreseeable that facts may evolve

through the discovery of this matter to show that the moving defendants were a motivating or

moving force in obtaining the police actions in this case, similar to the private individual's

responsibility in *Dohner v. Neff, supra.* (the wife invoking police aid in repossessing a motor

vehicle).    The possible facts that might arise in discovery might demonstrate that

Rimmel/Property Advisory Group, importuned the police and probation officers to conduct their

searches. Thus, at this stage, it would be premature to dismiss this case in view of the fact that

there is the possibility that the plaintiff could prove a set of facts, which would support the claims asserted here. As followed in previous cases, the appropriate procedure is to allow discovery in connection with this motion to dismiss and to revisit the motion at some reasonable later date. [6]

The reliance by the defendants upon *Nanya-Nasshut Ex. Rel. Hand v. Centex Home Equity Corp., 2002 WL 22871667 (E.D.Pa. 2003)* is inappropriate. The defendants argue that any action brought under *§1985(3)* is misplaced. In relying upon that case, the defendants argue that any action brought under *§1985(3)* can only involve private individuals only when the rights being sought to be protected are for involuntary servitude and the right to interstate travel. The defendants misapply that holding. The footnote upon which the defendants rely *(Id. at n. 5)* describe the circumstances in a *§1985(3)* cause of action which arises **solely** against private actors. That is not the case here, in this case it is alleged there was a conspiracy between the private defendants, Rimmel/Property Advisory Group, and state actors, the New Castle County police officers and State Probation and Parole officers. Thus, this is not a situation of a solely private defendant acting alone, but it is alleged it was a joint effort by both private and state actors.

The defendants' argument that the actions in this case are not the sort of action that is "exclusively reserved to the state" (moving defendants' "Legal Argument" III A. 1) implies that the defendants agree that the analysis in this case should be under the *Griffin v. Breckenridge, supra.* If the search of the plaintiffs' apartments is not of the sort which exclusively belongs to

---

[6] Since this case is being decided at the initial pleading stage, all that would have had to have been done is to have made the allegation that there was an agreement by the moving defendants, with the State and County actors to violate the plaintiffs' rights. However, because of the lack of discovery as to how it came to be that the moving defendants gave the keys to the state actors, given the requirements of *Fed.R.Civ.Proc. Rule 11*, such allegation could not be made until after discovery had been conducted.

the state, the *Griffin v. Breckenridge* standard, which applies to conspiracies by private individuals, and requires only proof of racial animus, rather than other the more stringent standard of *United Brotherhood of Carpenters and Joiners of America, supra.*, to sustain a finding of conspiracy under *§1685(3)*.

Even under the tests relied upon by the defendant in *Mark v. Borough of Hatboro, 51 F.3d 1157 (3d Cir. 1995)*, the Court pointed out in that case, one inquiry which permits a finding of state action is "...whether 'the private party has acted with the help of or in concert with state officials' *McKeesport Hospital v. Accreditation Counsel for Graduate Medical Ed., 24 F.3d 519, 524 (3d Cir. 1994)*." Further, under that case, it is clear that the actions of the moving defendants were dependant upon and relied upon the assistance and benefits of the governmental authority exercised by the State and County defendants.

For these reasons, it would inappropriate to dismiss this complaint as to the Rimmel/Property Advisory Group defendants.

### III.    THE MOVING DEFENDANT'S VIOLATED THE PLAINTIFFS' RIGHT OF PRIVACY UNDER THE DELAWARE LANDLORD AND TENANT STATUE.

The provisions of Delaware's Landlord Tenant Statute, specifically *25 Del.C. §5509(b)* provides in relevant part:

> "The landlord shall not abuse (the) right of access, nor use it to harass a tenant.  A landlord shall give the tenant at least 48 hours of notice of landlord's intent to enter, except for repairs requested by the tenant, and shall enter only between 8:00 a.m. and 9:00 p.m." *25 Del.C. §5509(b).*

The statute goes on to state that a tenant shall permit the landlord to enter the rental unit at "reasonable times".  *25 Del.C. §5509(c).*

It has been well recognized one's legitimate expectations of privacy are strongest when the invasion is into one's own home.  As the United States Supreme Court stated, private dwellings are "afforded the most stringent Fourth Amendment protection."  *United States v. Martinez-Fuerte, 428 U.S. 543, 561, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976).  See also:  Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)*(holding that "...physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.")

As stated in Argument II, it is possible that the facts in this case will, after appropriate discovery indicate that the landlord importuned the State and County defendants into conducting their criminal sweep of Lexington Green Apartments.  If in fact that occurred, then the landlord was utilizing the efforts of the State and County defendants to do indirectly what they are not permitted to do directly, a course of action, which the Delaware Courts has uniformly rejected. *Petition of Horsey 545 A.2d 629 (Del.Supr. 1988), Rigsby v. Tyre, 380 A.2d 1371 (Del.Super.*

*1977); Hodgson v. Superior Court in and for New Castle County, 239 A.2d 222 (Del.Supr. 1968).*

More importantly, the enactment of the Delaware Landlord Statute, with its restrictions on the access by a landlord to a tenant's premises supercedes any common law contained in the Restatement of Torts 2d. The enactment of a statute often supercedes the common law as stated in the Restatement. *Matland v. U.S., 25 F.2d 752, 753 (3d Cir. 1961); Baker v. Smith & Wesson, Corp., 2002 WL 31741522(Del.Super. 2002)*(Attached hereto as Exhibit No.2). Thus, the defendants reliance upon the Restatement of Torts 2d, §52B is misplaced and inappropriate, since any common law contained in the Restatement has, in this landlord-tenant situation, been superceded by the Delaware Statute, *25 Del.C. §5509(b).*

Accordingly, not only should this Court not dismiss the claim under *42 U.S.C. §1985(3),* but its supplemental jurisdiction over the state claim for invasion of privacy is appropriate given the cited statute.

## CONCLUSION

For the reasons herein, the moving defendant's motion to dismiss should be denied.


Respectfully Submitted,


GARY W. ABER (DSB #754)
Aber, Goldlust, Baker & Over
702 King Street, Suite 600
P.O. Box 1675
Wilmington, DE 19899
(302) 472-4900
Attorney for Plaintiffs

DATED: May 9, 2005

# EXHIBIT NO. 1

Westlaw.

Slip Copy                                                                    Page 1

2005 WL 823867 (D.Del.)

**(Cite as: 2005 WL 823867 (D.Del.))**

---

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Jerry A. HURST, pro se, Plaintiff,
v.
CITY OF REHOBOTH BEACH, et al., Defendants.
**No. Civ.A. 03-362-KAJ.**

March 31, 2005.
Jerry A. Hurst, Arlington, Virginia, pro se.

Colin M Shalk, Casarino, Christman & Shalk, P.A., Wilmington, Delaware, for defendants City of Rehoboth Beach and Walter Speakman.

Kevin J. Connors, and Thomas J. Gerard, Marshall, Dennehey, Warner, Coleman & Groggin, Wilmington, Delaware, for defendants Keith Banks, Paul Parsons, Jaime Riddle, Michael Armstrong, Collette Sutherland, Bonnie Ladd, Eric Glasco, Nicole Reynolds, John Bushey, and Frances Bucci.

Roger D. Landon, Murphy, Spadaro & Landon, Wilmington, Delaware, for defendant John Wothers.

Roger D. Landon, Murphy, Spadaro & Landon, Wilmington, Delaware, and Philip Thomas Edwards, Philip Thomas Edwards, Wilmington, Delaware, for defendant Tammie Morrison.

Bruce C. Herron, Akin & Herron, P.A., Wilmington, Delaware, for defendants Sussex County, R.N. Whittle, Dr. Burns, Two Unknown Correctional Officers, P. Harrison, B.A. Gunter, M.D., and Hubert Pey.

Bruce C. Herron, Akin & Herron, P.A., Wilmington, Delaware, and Stuart B. Drowos,

Department of Justice, Wilmington, Delaware, for defendants Sussex Correctional Institution and Rick Kearney.

Louis J. Rizzo, Jr., Reger & Rizzo, LLP, Wilmington, Delaware, for defendants Atlantic Sands Hotel and Conference Center, Rick Perez, and Sean Miller.

MEMORANDUM OPINION

JORDAN, J.

I. INTRODUCTION

*1 This is an action in which plaintiff Jerry A. Hurst ("Plaintiff") asserts violations of constitutional rights and statutory rights under 18 U.S.C. § 242 and 42 U.S.C. § 1983, and various state rights [FN1] against numerous defendants. [FN2] (*See* Docket Item ["D.I."] 1.) Presently before me are four motions filed by Plaintiff and ten motions filed by defendants. The motions filed by Plaintiff include: a Request for Default and Motion for Default Judgment (D.I.64); a Motion for Leave to Proceed *in forma pauperis* (D.I.92); a Motion for Miscellaneous Relief (D.I.96); and a Motion to Amend Complaint (D.I.101). The motions filed by the defendants include: a Motion to Dismiss (D.I.8) filed by Sussex County and Rick Kearney, R.N. Whittle, Dr. Burns, two unknown correctional officers, P. Harrison, B.A. Gunther, M.D., and Hubert Pey (collectively, "the Sussex County Defendants") in their official capacities "as employees or otherwise" with Sussex County; a Motion to Dismiss (D.I.9) filed by Walter Speakman ("Speakman"); a Motion for a More Definite Statement (D.I.10) filed by Speakman; a Motion to Dismiss (D.I.20) filed by Keith Banks ("Banks"), Collette Sutherland ("Sutherland"), Bonnie Ladd ("Ladd"), Eric Glasco ("Glasco"), Nicole Reynolds ("Reynolds"), John Bushey ("Bushey"), and Frances Bucci ("Bucci"); a Motion

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                          Page 2

2005 WL 823867 (D.Del.)

**(Cite as: 2005 WL 823867 (D.Del.))**

to Dismiss (D.I.58) filed by John Wothers ("Wothers"); a Motion to Strike and/or Motion for Relief from Judgment (D.I.67) filed by Sands, Inc. t/a Atlantic Sands Hotel and Conference Center (the "Sands"), Rick Perez, and Sean Miller (collectively, "the Sands Defendants"); a Motion to Dismiss (D.I.82) filed by the Sands Defendants; a Motion for Joinder of Tammie Morrison ("Morrison") in the City of Rehoboth's Response to Plaintiff's Motion of December 27, 2004 [FN3] (D.I.115); a Motion for Joinder of Glasco, Banks, Paul Parsons ("Parsons"), Jaime Riddle ("Riddle"), Michael Armstrong ("Armstrong"), Sutherland, Ladd, Reynolds, Bushey, and Bucci in the Response filed by the City of Rehoboth to Plaintiff's Motion of December 27, 2004 (D.I.116); and a Motion for Joinder of Rick Kearney and Sussex Correctional Institution ("SCI") in the Response filed by the City of Rehoboth to Plaintiff's Motion of December 27, 2004 (D.I.117).

> FN1. Specifically, Plaintiff alleges violations of the First, Fourth, Fifth, Eighth, and Fourteenth Amendments, conspiracy to violate 18 U.S.C. § 242 while acting under the color of law, intentional infliction of emotional distress, negligent training and supervision, malicious abuse of process, false arrest, false imprisonment, denial of medical treatment, and various state law violations, including breach of contract, invasion of privacy, false arrest and imprisonment, assault and battery, malicious prosecution, abuse of process, negligence, and gross negligence. (Docket Item ["D.I."] 1 at 13-17.)

> FN2. Specifically, Plaintiff has named 25 defendants, including the City of Rehoboth Beach; 10 police officers for the City of Rehoboth Beach: Banks, Parsons, Riddle, Armstrong, Sutherland, Ladd, Glasco, Reynolds, Bushey, and Bucci; two E.M.T.'s for the City of Rehoboth Beach: Wothers and Morrison; the City Solicitor for the City of Rehoboth Beach: Walter Speakman; Sussex County; Sussex

Correctional Institution ("SCI"); 7 alleged employees of Sussex County and/or SCI: Kearney, R.N. Whittle, Dr. Burns, two unknown correctional officers, P. Harrison, B.A. Gunter, M.D., and Hubert Pey; and the Atlantic Sands Hotel and Conference Center and two employees, Sean Miller and Rick Perez. (D.I. 1, Complaint Caption.)

> FN3. Although D.I. 115, 116, and 117 refer to Plaintiff's motion of December 27, 2004, I understand them to be directed to the City of Rehoboth's response (D.I.114) to Plaintiff's motion to amend his complaint (D.I.101), and Plaintiff's subsequent response (D.I.113) dated December 27, 2004, but actually filed on December 29, 2004.

Jurisdiction is proper under 28 U.S.C. § 1331. For the reasons set forth, Plaintiff's Request for Default and Motion for Default Judgment (D.I.64) will be denied; Plaintiff's Motion for Leave to Proceed *in forma pauperis* (D.I.92) will be denied as moot; Plaintiff's Motion for Miscellaneous Relief (D.I.96) will be denied; and Plaintiff's Motion to Amend the Complaint (D.I.101) will be denied. Further, Sussex County and the Sussex County Defendants' Motion to Dismiss (D.I.8) will be granted; Speakman's Motion to Dismiss (D.I.9) will be granted; Speakman's Motion for a More Definite Statement (D.I.10) will be denied as moot; defendants Banks, Sutherland, Ladd, Glasco, Reynolds, Bushey, and Bucci's Motion to Dismiss (D.I.20) will be granted; defendant Wothers' Motion to Dismiss (D.I.58) will be granted; the Sands Defendants' Motion to Dismiss (D.I.82) will be granted; the Sands Defendants' Motion to Strike and/or Motion for Relief from Judgment (D.I.67) will be denied as moot; and the Motions for Joinder (D.I.115, 116, 117) will be denied as moot.

II. BACKGROUND [FN4]

> FN4. The following rendition of background information does not constitute findings of fact and is cast in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 823867 (D.Del.)

**(Cite as: 2005 WL 823867 (D.Del.))**

Page 3

light most favorable to the non-moving party.

*2 On April 9, 2001, Plaintiff telephoned the Rehoboth Beach Police Department via 911 on two separate occasions. (D.I. 9 at 1.) On the first occasion, he requested a massage, and upon responding to his call, the police advised him not to use 911 for nonsense complaints. (D.I. 9 at 1.) Plaintiff then called 911 a second time, this time requesting ambulance transportation. (*Id.*; D.I. 1 at 9.) When the police responded to Plaintiff's second call, Plaintiff refused to open the door to his hotel room at the Sands. (D.I. 1 at 8.) Plaintiff asserts that he told the responding officers, Parsons, Riddle, and Armstrong, that he was fine, that he didn't want their services, and that they should leave despite his calling 911. (*Id.*) Plaintiff alleges that the police officers then gained entry to his room by obtaining a key from the hotel clerk, Miller. (*Id.*) At this point, Plaintiff asserts that he was handcuffed, sprayed with pepperspray, and arrested. [FN5] (*Id.* at 7-9.) Plaintiff alleges that he was "repeatedly smashed against the police car" by Parsons. (*Id.* at 8.) He was then taken before a local magistrate and then to a hospital where he was allegedly treated for eye and other injuries and given prescription medicine. [FN6] (*Id.* at 10.) Subsequently, he was transported to Sussex Correctional Institution ("SCI") and incarcerated there for approximately 24 hours. (*Id.* at 11.)

> FN5. Defendant Speakman asserts that upon the officers entering Plaintiff's hotel room, Plaintiff became "disorderly, aggressive and eventually violent," and was thus arrested. (D.I. 9 at 1.)

> FN6. Because Plaintiff's complaint does not set forth events in strictly chronological order, it is unclear whether he was taken before the magistrate before being taken to the hospital, or vice versa.

Plaintiff asserts various allegations of wrongdoing against correctional officers identified only as "John Doe I" through "John Doe X." (*See id.* at 11-12A.) At SCI, Plaintiff alleges that he was beaten, denied

proper food and water, and subjected to an involuntary taking of his blood and injection of "tuburculin." (*Id.* at 11.) Plaintiff alleges that he was subsequently ordered released "to the street" at approximately 9:30 p.m. on April 9, 2001, but was not actually released until four or five hours later. (*Id.* at 12.) During that time, Plaintiff asserts that he was forced to march, in the rain, back and forth between two buildings while passing close to a "vicious German shepard attack dog who barked and lunged" at him. (*Id.*) Upon release, Plaintiff asserts that John Doe IV refused to return his personal items, including his jacket, money, wallet, credit cards, keys and prescription medicine. (*Id.*) Eventually, Plaintiff went to the Rehoboth Beach Police Department where his personal items were returned to him by Sgt. Sutherland. (*Id.* at 12A.)

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) requires a court to accept as true all material allegations of the complaint. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.,* 140 F.3d 478, 483 (3d Cir.1998) (internal citation omitted). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* (internal citation omitted). The moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991).

## IV. DISCUSSION

### A. *Plaintiff's Motions*

1. Request for Default and Motion for Default Judgment

*3 The Third Circuit has "repeatedly stated [its] preference that cases be disposed of on the merits whenever practicable." *Jorden v. National Guard Bureau,* 877 F.2d 245, 251 (3d Cir.1989) (quoting *Hritz v. Woma,* 732 F.2d 1178, 1180-81 (3d Cir.1984)) (other internal citation omitted). The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 4

2005 WL 823867 (D.Del.)

**(Cite as: 2005 WL 823867 (D.Del.))**

decision to deny a motion for default judgment lies within the discretion of the district court. *See Jorden,* 877 F.2d at 250-251 (the decision to deny a motion for default judgment is reviewed under an abuse of discretion standard) (internal citations omitted); *Chamberlain v. Giampapa,* 210 F.3d 154, 164 (3d Cir.2000) (noting the same standard of appellate review). In deciding whether to grant a motion for default judgment, a court should consider the following factors: "(1) prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a litigable defense, and (3) whether defendant's delay is due to culpable conduct." *Chamberlain,* 210 F.3d at 164 (citing *United States v. $55,518.05 in U.S. Currency,* 728 F.2d 192, 195 (3d Cir.1984)). Plaintiff has filed a request for default and motion for default judgment against Morrison, the Sands Defendants, R.N. Whittle, and Dr. Burns (D.I. 64 at 1-2.) In denying Plaintiff's request and motion, I first note that he has not alleged any prejudice if default is denied. Second, each defendant has a litigable defense. Specifically, as discussed *infra* Parts IV.B.1. and IV.B.5., Plaintiff's complaint against the Sands Defendants, R.N. Whittle, and Dr. Burns will be dismissed. Further, Morrison has filed an answer to Plaintiff's complaint raising litigable affirmative defenses, such as qualified immunity and statutory bars. (*See* D.I. 57, Affirmative Defenses.) Third, Plaintiff has not asserted that any delay in responding to his complaint was due to culpable conduct, "which in the Third Circuit is conduct that is 'taken willfully or in bad faith." ' *Chamberlain,* 210 F.3d at 164 (quoting *Gross v. Stereo Component Sys., Inc.,* 700 F.2d 120, 124 (3d Cir.1983)). Thus, Plaintiff's request and motion for default judgment (D.I.64) will be denied.

2. Motion for Leave to Proceed *in forma pauperis*

Plaintiff has filed a motion for leave to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915 (D.I.92). Plaintiff, however, paid the filing fee in full on April 9, 2003, executed summonses for each defendant, with the exception of Wothers, and each defendant has been served pursuant to Federal Rule of Civil Procedure 4. The paid filing fee cannot properly be refunded to Plaintiff, and, therefore,

Plaintiff's motion is moot.

3. Motion for Miscellaneous Relief

Plaintiff filed what he claims is a "demand" for $384.00 from sixteen of the named defendants [FN7] and a for Rule 4 evidentiary hearing for "direct rule 4 costs including [what he calls] extraordinary and extensive interstate 'effecting service' requiring rental cars, lodging, food, professional and non-professional services, [and] countless trips and investigations regarding ... defendants with changing addresses and employment." (D.I. 96 at 3.) I consider Plaintiff's "demand" to be a motion under Federal Rule of Civil Procedure 4 for costs relating to effecting service upon those defendants.

> FN7. Plaintiff has named the following defendants: Banks, Parsons, Riddle, Armstrong, Sutherland, Ladd, Glasco, Reynolds, Bushey, Bucci, Wothers, Morrison, Kearney, and the Sands Defendants. (D.I. 96 at 3.)

*4 Because Plaintiff has not provided any supporting documentation to establish the "extraordinary and extensive" measures to affect service, nor directly related any of these alleged costs to the particular defendants named in his motion, I must deny Plaintiff's motion at this time.

4. Motion to Amend Complaint

Plaintiff filed a motion to amend his complaint (D.I.101) due to what he alleges is illegally withheld evidence. All motions, including a proper request for leave to amend a complaint, must "state with particularity the grounds therefor." Fed.R.Civ.P. 7(b). Although submitting a copy of the proposed amended complaint is not an absolute prerequisite to granting such a motion, when, as in this case, the court does not know precisely what Plaintiff intends to allege in his amended complaint, it is appropriate to deny such request. *See Lempert v. Singer,* 766 F.Supp. 1356, 1360 (D.V.I.1991) (denying plaintiff's motion for leave to amend complaint). In this case, the content of Plaintiff's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 823867 (D.Del.)

(Cite as: 2005 WL 823867 (D.Del.))

Page 5

proposed amendments is entirely unclear from his motion. Thus, I must deny his present request to amend.

B. *Defendants' Motions*

1. Sussex County Defendants' Motion to Dismiss

Sussex County, along with the Sussex County Defendants in their official capacities as "employees or otherwise" with Sussex County, have filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (D.I.8.) Plaintiff's claim against Sussex County is based on his assertion in paragraph 10 of his complaint that SCI "is a public institution organized, operated, governed, funded and/or existing under the laws of Sussex County and/or the State of Delaware, which institution at all times relevant employed the defendant personnel of said institution." (D.I. 1 at ¶ 10.)

It is undisputed that Sussex County is a State facility and that Sussex County does not operate SCI, nor have any interest in the facility. (D.I. 8 at ¶ 2 (citing Affidavit of Robert L. Stickles, July 15, 2003, D.I. 8, Ex. B.)) Furthermore, Sussex County does not employ any of the individuals listed on this motion or any correctional officers. (*Id.* (citing Affidavit of Robert L. Stickles, July 15, 2003, D.I. 8, Ex. B at ¶¶ 3-4.)) Based on the uncontested affidavit, even under the more lenient standard afforded pro se litigants, I must dismiss Plaintiff's complaint against Sussex County, and the so-called Sussex County Defendants in their official capacities as "employees or otherwise" with Sussex County . [FN8]

> FN8. If these individual defendants are in fact state employees being sued in their official capacity, then § 1983 does not provide for the remedy Plaintiff seeks, namely compensatory and punitive damages, because the suit is then effectively against the state, which is not a "person" subject to liability under § 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). Furthermore, 18

U.S.C. § 242, which is also cited by Plaintiff, is a criminal statute and does not provide a private cause of action.

Additionally, because the complaint does not allege any specific facts relating to Sussex County or the Sussex County Defendants, I will *sua sponte* dismiss plaintiff's complaint against them in their individual capacities. [FN9]

> FN9. I note that Kearney has submitted a Memorandum of Points and Authorities in Support of Pending Motions to Dismiss (D.I.110) in which he joined D.I. 8, 9, 20, 58, and 82. Thus, because the complaint does not allege specific facts against Kearney, Plaintiff's complaint against him must be dismissed, as noted *supra* Part IV.B.1.

2. Speakman's Motion to Dismiss

Defendant Speakman filed a motion to dismiss for failure to state a claim upon which relief may be granted (D.I.9) pursuant to Fed.R.Civ.P. 12(b)(6). Again, the caption of Plaintiff's complaint includes Speakman in his individual and official capacity as City Solicitor for the City of Rehoboth Beach, but does not allege any specific factual allegations against him in either capacity. Thus, even under the more lenient standard for pro se litigants, I must dismiss Plaintiff's complaint against Speakman in both his individual and official capacity because Plaintiff has not alleged any facts in support of his claim that would entitle him to relief. [FN10]

> FN10. Because I will grant Speakman's motion to dismiss (D.I.9), his motion for a more definite statement (D.I.10) is moot.

3. Motion to Dismiss by Banks, Sutherland, Ladd, Glasco, Reynolds, Bushey and Bucci

*5 The defendants listed above have filed a motion to dismiss (D.I.20) pursuant to Rule 12(b)(6). Plaintiff names each of these defendants in their individual and official capacities as police officers for the City of Rehoboth Beach in the caption of his

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 6

2005 WL 823867 (D.Del.)

**(Cite as: 2005 WL 823867 (D.Del.))**

complaint. (D.I. 1 at 1.) Yet, Plaintiff does not allege any specific factual allegations against any of these defendants in either capacity. [FN11] Thus, I must dismiss Plaintiff's complaint against these defendants in both their individual and official capacities because Plaintiff has failed to allege any facts to support any claim that he may have against them.

> FN11. In fact, the only mention of any of these defendants is in paragraph 35 of Plaintiff's complaint, where he merely notes that "Sutherland returned [his] property" after his release. (D.I. 1 at ¶ 35.) This lone fact does not support any of the claims brought by Plaintiff in this action upon which any relief could be granted.

4. Motion to Dismiss by Wothers

Wothers has filed a motion to dismiss (D.I.58) for failure of service. By Order dated August 26, 2003, I ordered Plaintiff to complete service of process and file returns of service with the Court by October 10, 2003. (D.I.33) Based on the record, Wothers has still not been served, even a year and half after the expiration of my October 10, 2003 deadline. [FN12] Thus, I must grant Wothers motion to dismiss.

> FN12. Although Plaintiff asserts that Wothers has evaded service, Plaintiff offers nothing in support of such an assertion except the vague and unsupported assertion that Wothers somehow arranged with his co-workers to evade service. (D.I. 60 at ¶ 7.) Additionally, in Plaintiff's letter brief requesting an extension of time to serve (D.I.60), he asks for a "few days extension ... to immediately effect service on Mr. Wothers' counsel of record herein." (*Id.* at ¶ 11.) Yet, there is no record that, even after a year and half later, Plaintiff has done so.

5. Motion to Dismiss by the Sands Defendants

The Sands Defendants have filed a motion to dismiss (D.I.82) pursuant to Rule 12(b)(6). [FN13] In support of their motion, the Sands Defendants assert that Plaintiff's constitutional claims and claims based upon 42 U.S.C. § 1983 and 18 U.S.C. § 242 must be dismissed because they are "private sector employees and entities, and thus [were] not operating 'under color of law.' " (D.I. 82 at ¶ 7.) Plaintiff's complaint names each of the Sands Defendants "individually and in their official capacities as employees of the Atlantic Sands Hotel and Conference Center." (D.I. 1, Complaint Caption.)

> FN13. These defendants have also filed a Motion to Strike and/or Motion for Relief from Judgment (D.I.67). Because Plaintiff's Motion for Default Judgment will be denied, *see supra* Part IV.A.1., I do not need to reach this motion and thus consider it moot.

"[A] private party who willfully participates in a joint conspiracy with state officials to deprive a person of a constitutional right acts 'under color of state law' for purposes of § 1983." *Abbott v. Latshaw,* 164 F.3d 141, 147- 48 (3d Cir.1998), *cert. denied,* 527 U.S. 1035 (1999) (internal citations omitted). The Third Circuit has endorsed the Seventh Circuit's approach to determine whether a complaint alleges the prerequisites of a civil conspiracy. *See Melo v. Hafer,* 912 F.2d 628, 638 n. 11 (3d Cir.1990) (citing *Hampton v. Hanrahan,* 600 F.2d 600, 620-21 (7th Cir.1979), *rev'd in part on other grounds,* 446 U.S. 754 (1980)), *aff'd,* 502 U.S. 21 (1991). "A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." ' *Hampton,* 600 F.2d at 600-621 (internal quotations omitted). In *Abbott,* the Third Circuit reversed a district court's *sua sponte* dismissal of the plaintiff's complaint for failure to allege such a conspiracy. *Abbott,* 164 F.3d at 148. The basis for the reversal was that the plaintiff had alleged in his complaint that the state

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 7

2005 WL 823867 (D.Del.)

(Cite as: 2005 WL 823867 (D.Del.))

official acted "at the instance and request of [the private party defendant]" and that the private party defendant was thus "acting under color of state law." *Id.*

*6 In the instant case, however, the facts are quite different. The only factual grounds alleged in the complaint against the Sands Defendants are the turning over of the Plaintiff's room key to the police, and the police defendants' failure to interview Sean Miller. (See D.I. 1 at ¶ ¶ 21, 24.) First, Plaintiff admits that he called 911 twice, the second time, to request an ambulance. (D.I. 1 at 9.) Second, Plaintiff recognizes that the police only arrived at his hotel room in response to his 911 call. (*Id.*) Third, it was only after Plaintiff refused to open the door to his room as requested by the police, that the police, in response to Plaintiff's emergency call, "obtain[ed] the key from the hotel clerk." (*Id.* at 8.) Plaintiff thus acknowledges that, unlike the facts in *Abbott*, the police were acting in response to a request made by Plaintiff, not the private party Sands Defendants. Further, the hotel clerk's turning over of the key to Plaintiff's room was in response to a law enforcement request based on Plaintiff's 911 phone call claiming an emergency. This can in no way be considered an action implying any type of conspiracy. Thus, this is precisely a case in which the complaint contains conclusory allegations of concerted action, as asserted in Count IV of Plaintiff's complaint, but is devoid of facts actually reflecting joint action. *See Abbott,* 164 F.3d at 148 (citing *Fries v. Helsper,* 146 F.3d 452, 458 (7th Cir.1998), *cert. denied,* 525 U.S. 930 (1998) (affirming dismissal of complaint where plaintiff "included only accusations and conclusory allegations that the defendants conspired")). Accordingly, because Plaintiff's complaint does not contain sufficient facts to support a conspiracy allegation, I will grant the Sands Defendants' motion to dismiss.

Additionally, Plaintiff has asserted various state law claims against the numerous defendants in this case. The only state law claim that Plaintiff states is applicable specifically to the Sands Defendants is for breach of contract, based on the rental

agreement for the hotel room rented by Plaintiff. [FN14] (D.I. 1 at ¶ 59.) Plaintiff, however, has not attached a copy of a rental agreement contract, nor provided any facts upon which such an asserted breach could possibly be found. Thus, Plaintiff fails to state a claim under which relief could be granted against the Sands Defendants.

> FN14. There are no other facts alleged in Plaintiff's complaint upon which relief could be granted based on the other asserted state law claims, even assuming Plaintiff intended to assert them against the Sands Defendants.

6. Motions for Joinder

In D.I. 115, 116, and 117 various defendants have submitted unopposed motions to join the City of Rehoboth Beach's Response to Plaintiff's Motion of December 27, 2004 (D.I.114), in which the City of Rehoboth essentially objects to Plaintiff's request for leave to amend his complaint. Because I have denied Plaintiff's motion to amend, I will deny these motions as moot, in so far as the specifically denied motion to amend is concerned.

V. CONCLUSION

Accordingly, Plaintiff's Request for Default and Motion for Default Judgment (D.I.64) will be denied; Plaintiff's Motion for Leave to Proceed *in forma pauperis* (D.I.92) will be denied as moot; Plaintiff's Motion for Miscellaneous Relief (D.I.96) will be denied; and Plaintiff's Motion to Amend the Complaint (D.I.101) will be denied. Further, Sussex County and the Sussex County Defendants' Motion to Dismiss (D.I.8) will be granted; Speakman's Motion to Dismiss (D.I.9) will be granted; Speakman's Motion for a More Definite Statement (D.I.10) will be denied as moot; defendants Banks, Sutherland, Ladd, Glasco, Reynolds, Bushey, and Bucci's Motion to Dismiss (D.I.20) will be granted; defendant Wothers' Motion to Dismiss (D.I.58) will be granted; the Sands Defendants' Motion to Dismiss (D.I.82) will be granted; the Sands Defendants' Motion to Strike and/or Motion for Relief from Judgment (D.I.67) will be denied as

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 823867 (D.Del.)

**(Cite as: 2005 WL 823867 (D.Del.))**

moot; and the Motions for Joinder (D.I.115, 116, 117) will be denied as moot. An appropriate order will follow.

2005 WL 823867 (D.Del.)

  **Motions, Pleadings and Filings (Back to top)**

• 1:03CV00362 (Docket)

    (Apr. 09, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT NO. 2

Westlaw.

Not Reported in A.2d

2002 WL 31741522 (Del.Super.)

**(Cite as: 2002 WL 31741522 (Del.Super.))**

Page 1

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.
Mayor James M. BAKER, and the City
Wilmington, Plaintiffs,
v.
SMITH & WESSON CORP., Sturm Ruger &
Company, Inc., Beretta U.S.A., Colt's
Manufacturing Co., Glock, Inc., Taurus
International Manufacturing, Inc.,
Sigarms, Inc., Bryco Arms, B.L. Jennings, Inc.,
Phoenix Arms Neavegar, Inc.,
(D/B/A "Intratec", HI-Point Firearms, American
Shooting Sports Council, Inc.,
National Shooting Sports Foundation, Inc., and
Sporting Arms and Ammunition
Manufacturers Institute, Inc., Defendants.
**No. Civ.A. 99C-09-283-FS.**

Original Briefing Completed April 26, 2002.
Last Supplemental Submission Nov. 6, 2002.
Decided Nov. 27, 2002.

Upon Defendants' Motion for Summary
Judgment--Granted.

Aaron R. Goldstein, City of Wilmington Law
Department, Wilmington, Delaware, for Plaintiff.

Arthur D. Kuhl, Law Office of Michael Pedicone,
P.A., Wilmington, Delaware, for Defendant.

William J. Cattie, III, and Barbara Fruehauf, Cattie
& Fruehauf, Wilmington, Delaware, for Defendant.

John E. James, Potter Anderson & Corroon,
Wilmington, Delaware, for Defendant.

Stephen P. Casarino, Casarino Christman & Shalk,
Wilmington, Delaware, for Defendant.

P. Clarkson Collins, Jr., Morris James Hitchens &
Williams, Wilmington, Delaware, for Defendant.

Allen M. Terrell, Jr., Richards Layton & Finger,
Wilmington, Delaware, for Defendant.

James F. Bailey, Jr., Bailey & Wetzel, P.A.,
Wilmington, Delaware, for Defendant.

*OPINION and ORDER*

SILVERMAN, J.

*1 Frustrated and fed up with the mayhem caused
by misused handguns, the Mayor of Wilmington on
behalf of the City has sued the nation's handgun
manufacturers. The lawsuit is part of an effort by
municipalities around the country to force the
handgun industry either to make its products safer
or go out of business. [FN1] The Mayor and the
City have a laudable ulterior motive, reducing
handgun violence. This case, however, presents a
direct claim for money damages to reimburse the
City for the costs it has incurred dealing with
matters involving misused handguns.

> FN1. *See, e.g. City of Chicago v. Beretta
> U.S.A. Corp.,* Np. 98 CH 15596 (Cir. Ct.
> of Cook Cty., Ill. Sept. 15, 2000) *rev'd,*
> 2002 Ill.App. LEXIS 1001 (2002);
> *Penelas v. Arms Technology, Inc.,* 1999
> WL 1204353 (Fla.Cir.Ct. Dec. 13, 1999),
> *aff'd,* 778 So.2d 1042 (Fla.App.), *review
> denied;* 799 So.2d 218 (Fla.2001); *People
> of the State of New York v. Sturm, Ruger &
> Co., Inc.,* No. 402586/00 (N.Y.Sup.Ct.
> Aug. 10, 2001) (appeal pending); *Ganim v.
> Smith & Wesson Corp.,* 1999 WL 1241909
> (Conn.Super. Ct. Dec 10, 1999), *aff'd,* 780
> A.2d 98 (Conn.2001); *City of Atlanta v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 2

2002 WL 31741522 (Del.Super.)

(Cite as: 2002 WL 31741522 (Del.Super.))

*Smith & Wesson Corp.*, CA. No. 99VS0149217J (Ga. St. Ct., Oct 27, 1999); *City of Cincinnati v. Beretta U.S.A. Corp.*, 1999 WL 8009838 (Ohio Ct.Com.Pl., Oct. 7, 1999).

The complaint does not concern claims by direct victims of handgun violence, nor do the Mayor and City ask for injunctive relief to prevent the manufacturers from selling unreasonably dangerous products and creating a nuisance. Thus, the case squarely raises a question whether the City can recover the costs of municipal services, including police work and emergency response, from those who made it necessary for the City to incur those costs. As big and important an issue as handgun control is, before it can reach that issue the court must consider whether tortfeasors can be held liable for municipal costs.

In other words, the court must decide whether the common law prohibition on municipalities recovering costs from tortfeasors, known as the "municipal costs recovery rule" or in some cases "the firefighter's rule," is the law in Delaware. If it is, then the court must decide whether the rule applies to the damages that the Mayor and City might prove. If the Mayor and the City cannot establish any recoverable damages, then this case cannot survive in this court, which as a court of law only has authority to award money in civil cases.

I.
The Complaint's Allegations
The Mayor's and the City's complaint is a sweeping indictment of the handgun industry's methods, including the way handguns are designed, manufactured and marketed. The complaint alleges that handguns are not designed properly to reduce the risks posed by unauthorized or untrained people, especially children, who obtain them. The complaint emphasizes the manufacturers' failure to incorporate adequate safety devices to prevent accidental, unauthorized or unintentional discharges and the manufacturers' failure to provide devices that warn users when handguns are loaded. For example, the complaint points out that even when a semiautomatic pistol's magazine is removed, the

pistol still may have a round in the chamber. Nevertheless, handgun manufacturers continue to make and sell pistols without warning stickers, much less mechanisms that prevent supposedly unloaded handguns from firing.

The complaint also seeks to hold the manufacturers liable for distributing their inherently dangerous products in ways that allow them to fall into irresponsible or unauthorized people's hands, or into the hands of children and untrained adults. The complaint alleges that "a substantial portion of the handguns [defendants] produced, sold and distributed ended up in criminal hands, and were used for criminal purposes...." According to the complaint, the manufacturers "knew or should have known" that their products would be misused, causing grave injuries. Furthermore, allegedly it was foreseeable that the City would incur expenses providing emergency services "due to the threat of use of Defendants' firearms and for ... citizens harmed by the use of Defendants' firearms, as well as lost substantial tax revenues due to lost productivity."

*2 Throughout the complaint, the Mayor and City make general allegations about the City's damages. Typically, the complaint characterizes the City's damages as "funds expended for additional police protection and emergency services as well as other related costs." The complaint's specific damages recital is:

> As a direct and proximate result of the actions and inactions of Defendants ..., Plaintiffs have been obligated to pay and have paid millions of dollars in police services, and emergency services, and other related services due to the threat of use of Defendants' products and actions, and have lost substantial tax revenue due to lost productivity.

II.
The Case History
The Mayor and City filed suit on September 29, 1999. [FN2] The complaint touched off an explosion of litigation. In lieu of answers, Defendants filed dispositive motions. After receiving the parties' briefs, the court issued an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

2002 WL 31741522 (Del.Super.)

**(Cite as: 2002 WL 31741522 (Del.Super.))**

opinion and order on December 1, 2000 paring the complaint, but not dismissing it. That decision sparked an unsuccessful interlocutory appeal to Delaware's Supreme Court. [FN3] Eventually, answers to the complaint were filed and discovery disputes began immediately. The Mayor and City sought wide-ranging discovery, which Defendants opposed vigorously.

> FN2. The original Plaintiff was the Honorable James H. Sills, Jr., Mayor Baker's predecessor. Mayor Baker was substituted as Plaintiff under Superior Court Civil Rule 25(d)(1).

> FN3. *Smith & Wesson Corp., et al. v. Mayor James H. Sills, Jr. and The City Of Wilmington,* Del.Supr., No. 87, 2001, Holland, J. (March 13, 2001).

As the case unfolded and its expenses mounted, the court focused on one element of the Mayor and City's case—damages. The court became concerned that the Mayor and the City's damages would amount to nothing more than municipal costs, which might not be recoverable under the common law's municipal costs recovery rule. The court also appreciated that the discovery necessary to flesh out the damages issue need not be extensive. First, as plaintiffs the Mayor and City would know their own damages. Second, the Mayor and City would only need to show that some of their damages were recoverable in order to convince the court that they might prevail on that element of their case. To establish a viable damage claim in theory, the Mayor and City would not have to present all their recoverable damages, just a sample. But if the Mayor and City could not even demonstrate that a portion of their damages are cognizable, their complaint could not survive, no harm—no foul. So the court put the Mayor and City to the test.

At a hearing on June 15, 2001, the court called for a case management order establishing a schedule for abbreviated discovery designed to give the Mayor and City an opportunity to present some legally cognizable damages. The order was entered and as required, on December 11, 2001, the Mayor

and City submitted an offer of proof outlining some of the damages for which the Mayor and City now seek recovery. That submission precipitated the instant dispositive motions. Defendants argue that even if the Mayor and City can make good on their offer of proof, the municipal costs recovery rule precludes any recovery as a matter of law and, therefore, Defendants are entitled to summary judgment.

## III.
### The Offer of Proof as to Damages

*3 As mentioned above, the court gave the Mayor and City an opportunity to demonstrate some legally cognizable damages. Plaintiffs were not obliged to prove all their damages. They merely had to present enough evidence that when viewed in the light most favorable to them would justify further litigation. To meet the challenge, the Mayor and City made an offer of proof consisting of a five page summary by counsel, with supporting documents. The principal support for the offer of proof is a six page report by an economic consultant. The report relies on affidavits from knowledgeable senior police officials. The affidavits, in turn, rely on assorted police reports, financial reports, graphs and tables. The supporting material also includes five actual cases where handguns were criminally misused. The examples ranged from an accident involving a young man's shooting his girlfriend in the finger as he showed-off a recently acquired stolen handgun, to murder.

For the pending motion's purposes, the court must accept the offer of proof. Frankly, that does not require a stretch. The offer of proof tends to establish what the court already believes: beyond the terrible price it exacts in human terms, handgun violence costs the City plenty of money. For example, the offer of proof submits that the City spent over one million dollars investigating 263 shootings between 1997 and 2000, much of that for police overtime. The consultant's report concludes, in part, "that the Wilmington Police Department has absorbed real and significant economic damages as related to investigating gun incidents." Even under the generous standard of review for summary judgments, the court need not accept the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 4

2002 WL 31741522 (Del.Super.)

(Cite as: 2002 WL 31741522 (Del.Super.))

non-moving party's conclusions about the evidence. Nevertheless, the court easily agrees that the Mayor and City can prove that handgun violence has increased the City's expenses. Even Defendants do not dispute the Mayor and City's numbers and the consultant's conclusions, at this point.

In considering Defendants' dispositive motion, the court will assume not only that the Mayor and City can prove that they have money damages "related to investigating gun incidents." The court also will assume that: the damages are "related" to Defendants' products; Defendants' products are defective or negligently designed, manufactured and marketed; and the damages are proximately caused by Defendants.

As compared to the court's initial assumption that handgun violence is costly, some of those later assumptions require considerable stretching. For example, the consultant treats every shooting in Wilmington as caused by a defective product sold by a Defendant. Yet, it is likely that several of those shootings were by criminals who fully intended to employ the firearms as they did. In those cases, especially where the shooter acted with criminal intent, Defendants' liability is far from clear. Nevertheless, the court is relying uncritically on the offer of proof. But even if handgun violence costs the City a lot and even if the handgun manufacturers are to blame, as discussed below, that does not mean that the Mayor and the City have a justiciable damages claim.

*4 The offer of proof is noteworthy in one other way. It proffers no expert opinion, much less supporting evidence, to establish the Mayor's and City's claim that handgun violence has cost the City tax revenue through "lost productivity," or otherwise. The court gave the Mayor and City a full opportunity to present any case where handgun violence caused lost revenue. The court cannot assume that the City lost revenue because of handguns, much less that a jury could make a proper damages award for lost revenue and productivity.

Again, the court is willing to make the debatable

assumption here that some of the City's alleged damages might be Defendants' fault, even if it is unlikely that the entire increase in police overtime is attributable to handgun violence as the Mayor and City allege. But as to the Mayor's and City's lost revenue and productivity claim, it is entirely theoretical and speculative. The court, therefore, sees the Mayor's and City's potential damages claim as one entirely for increased emergency and investigative expenses, especially police overtime.

IV.

A. The Common Law's Municipal Costs Recovery Rule Applies in Delaware

Over the centuries leading up to the American revolution and since then a body of non-statutory jurisprudence, known as the common law, has been developed by the Anglo-American courts. [FN4] In many instances, the common law has been **superceded** by **statutes**. For example, the Uniform Commercial Code now governs many business transactions once controlled by contract, agency and property law precedents. [FN5] Similarly, the Workers' Compensation Act has largely replaced tort law as it applied to injured workers and their employers. [FN6] And until the current Criminal Code was enacted by the General Assembly in 1973, "it was possible to prosecute for common-law crimes." [FN7] Since 1923, much of the remaining common law has been collected and refined through the American Law Institute's authoritative " **Restatements** of the Law." [FN8] The common law, however, is still found in case decisions.

> FN4. *See, e.g., People v. Rehman,* 253 C.A.2d. 119 (1967), cited in Black's Law Dictionary (6th ed.1990).

> FN5. *Del.Code Ann.* tit. 6 § 1-102, § 1-103 (1999).

> FN6. *Del.Code Ann.* tit. 19 § 2304 (1999).

> FN7. *Del.Code Ann.* tit. 11 § 202 cmt. on § 202 (1973).

> FN8. William Draper Lewis, History Of The American Law Institute And The First

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 5

2002 WL 31741522 (Del.Super.)

**(Cite as: 2002 WL 31741522 (Del.Super.))**

Restatement Of The Law (1945).

In *Wilson v. State,* [FN9] a criminal case, our
Supreme Court held flatly: "Delaware follows the
common law except when changed by statute."
Although Delaware cases often consider whether
statutes have superceded the common law, it is
beyond dispute that *Wilson's* holding confirms the
common law's general viability in Delaware. [FN10]
The common law is in force here unless the
legislature or the courts say otherwise. At a
minimum, it is axiomatic that absent a statute to the
contrary, the court may adopt common law
doctrines covering legal issues it must decide.

FN9. 305 A.2d 312 (Del.1973).

FN10. *See, e.g., Schuster v. Derocile,* 775
A.2d 1029 (Del.2001); *Nationwide Gen.
Ins. v. Seeman,* 702 A.2d 915 (Del.1997);
*Hoesch v. National Railroad Passenger
Corp.,* 677 A.2d 29 (Del.1996); *Beattie v.
Beattie,* 630 A.2d 1096 (Del.1993);
*Claudio v. State,* 585 A.2d 1278
(Del.1991).

Under common law, the general rule in force in
other jurisdictions [FN11] is that "public
expenditures made in the performance of
governmental functions are not recoverable"
[FN12] from a tortfeasor in the absence of a
specific statute. This rule against "municipal cost
recovery" is rooted in the legislative policy of
taxing citizens to pay for these services. The lead
authority on the municipal cost recovery rule is *City
of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.,*
[FN13] which holds that "the cost of public
services for protection from fire or safety hazards is
to be borne by the public as a whole, not assessed
against the tortfeasor whose negligence creates the
need for the service." The court further explains
that:

FN11. *District of Columbia v. Air Florida,
Inc.,* 750 F.2d 1077, 1080 (D C. Cir1984).

FN12. *Koch v. Consolidated Edison Co. of
N.Y., Inc.,* 468 N.E.2d 1,8 (N.Y.1984),

*cert. denied,* 469 U.S. 1210 (1985).

FN13. 719 F.2d 322 (9th Cir.1983).

**\*5** [the] governmental entities themselves
currently bear the cost in question, and they have
taken no action to shift it elsewhere. If the
government has chosen to bear the cost for
reasons of economic efficiency, or even as a
subsidy to the citizens and their business, the
decision implicates fiscal policy; the legislature
and its public deliberative processes, rather than
the court, is the appropriate forum to address such
fiscal concerns. [FN14]

FN14. *Id.* at 324.

The municipal cost recovery rule, therefore, is
premised on the notion that state legislatures
establish local governments to provide core services
for the public and pay for these services by
spreading the costs to all citizens through taxation.
This concept also is expressed in *City of Bridgeton
v. B.P. Oil, Inc.,* [FN15] which holds in pertinent
part:

FN15. 369 A.2d 49, 54 (N.J.Super.1976).

Governments, to paraphrase the Declaration of
Independence, have been instituted among men to
do for the public good those things which the
people agree are best left to the public sector....
Nevertheless, there remains an area where the
people as a whole absorb the cost of such
services--for example, the prevention and
detection of crime. No one expects the rendering
of a bill (other than a tax bill) if a policeman
apprehends a thief....
*City of Bridgeton* further holds "that a municipal
corporation may not recover as damages the costs
of its governmental operations which it was created
to perform.... [FN16]

FN16. *Id.* at 54-55.

After *City of Flagstaff, District of Columbia v. Air
Florida* is the definitive authority on the municipal
cost recovery rule. During a snow storm in 1982, a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 6

2002 WL 31741522 (Del.Super.)

**(Cite as: 2002 WL 31741522 (Del.Super.))**

passenger jet operated by Air Florida took off from Washington National Airport, crashed into the 14th Street/Rochambeau Memorial Bridge and plunged into the Potomac. That disaster precipitated a flurry of litigation by the District of Columbia to recover for its emergency and cleanup expenses. Denying recovery, *District of Columbia* holds: [FN17]

>        FN17. *District of Columbia v. Air Florida,* 750 F.2d 1077 (1984).

We are especially reluctant to reallocate risks where a government entity is the injured party. It is critically important to recognize that the government's decision to provide tax-supported services is a legislative policy determination. It is not the place of the courts to modify such decisions. Furthermore, it is within the power of the government to protect itself from extraordinary emergency expenses by passing statutes or regulations that permit recovery from negligent parties.

There is no principled reason to reject in Delaware the common law's municipal cost recovery rule, as articulated in *City of Flagstaff, City of Bridgeton* and *District of Columbia.* To the contrary, the fact that Delaware's General Assembly has enacted statutes allowing some municipal cost recoveries suggests, by negative implication, that the General Assembly typically expects the State and local governments to cover their expenses through taxes and fees. [FN18] The court here adopts the reasoning behind the municipal cost recovery rule articulated in the cases presented above. Therefore, absent a legislative grant of authority, local governments in Delaware may not sue in order to recover the cost of municipal services.

>        FN18. *See, e.g., Del.Code Ann.* tit.17 § 511 (1995).

### B. The Municipal Costs Recovery Rule Applies to All Proffered Damages

*6 Having just rejected the Mayor's and City's argument that "Delaware does not recognize a municipal cost recovery rule of any kind," the court must address the two remaining arguments. The

Mayor and City claim that the City's proffered costs are not subject to the rule because the costs are on-going or the result of repeated conduct, rather than the product of discrete events. They also argue: "The State of Delaware has authorized recovery of [the proffered] costs by State and local governments through enactment of 11 Del. C. § 4101." That statute from the Criminal Code provides: "On conviction upon indictment or information for any crime or offense, all the costs shall be paid by the party convicted." The statute also allows the court to reduce to judgment its award of costs in criminal cases. That final alternative argument, which is based on a clearly inapplicable criminal statute, is without merit and it requires no further analysis. That leaves the Mayor's and City's claim that the rule does not apply to the proffered damages because they are "atypical," on-going or repetitive, and not discrete.

The Mayor and City's attempt to draw a distinction between the discrete or singular versus the "atypical," on-going or repetitive nature of the underlying torts is unconvincing. Whether a municipality is dealing with an isolated emergency or a continuing problem has little to do with the municipal cost recovery's rationale. But if it did, repetitive or on-going wrongs lend themselves to the rule better than isolated acts. Almost by their nature, repeated or on-going acts are predictable. Thus, a municipality grappling with a persistent problem, such as handgun violence, is better able to employ injunctive or legislative solutions than is a municipality reacting to an airliner's slamming into a bridge during rush-hour.

The handgun manufacturers virtually concede that if the General Assembly perceives that their products are causing problems like the Mayor and City suggest, they can be taxed. Using taxes or fines to address isolated torts is possible, but more problematic. Along the same line, the court assumes without deciding that if the Mayor and City can prove that the handgun industry is causing a nuisance in Wilmington as alleged, they are entitled to an injunction. The court's reasoning here is not novel.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 7

2002 WL 31741522 (Del.Super.)

**(Cite as: 2002 WL 31741522 (Del.Super.))**

This is not the first case to consider whether the municipal cost recovery rule bars suit by a municipality against handgun makers. *Board of Supervisors of Fairfax County, Virginia v. U.S. Home Corporation, et al.; [FN19] City of Cincinnati v. Beretta U.S.A. Corp, et al.; [FN20]* and *Penelas v. Arms Technology, Inc. et al.* [FN21] have advanced complaints similar to the Mayor's and City's. *Archer v. Arms Technology, Inc.,* [FN22] denied what was tantamount to a motion to dismiss based on the municipal cost recovery rule. *Archer,* however, was concerned by the possibility "that Plaintiffs could prove that the costs of the public nuisance constitute a 'distinct well-defined category unrelated to the normal provision of police, fire and emergency services." As discussed above, thanks to the proffer of damages this court now knows that the Mayor and City's claim only concerns normal, municipal services. Besides, there is little basis for distinguishing between "normal" municipal costs and other municipal costs. A cost is either a municipal cost or it is not. If a cost is a municipal cost, it is not recoverable under the rule.

>   FN19. 1989 WL 646518 (Va.Cir.Ct.).

>   FN20. 2000 WL 1133078 (Ohio App. 1 Dist.).

>   FN21. 1999 WL 1204353 (Fla.Cir.Ct.).

>   FN22. Case Nos. 99-912658 NZ Op., 99-912662 NZ Op. (Cir Ct. Wayne Cty., Mich. May 16, 2000) (appeal pending).

*7 To avoid the rule by characterizing their damages as they do, the Mayor and City rely heavily on *City of Boston v. Smith & Wesson Corp.* [FN23] That precedent is not helpful for two reasons. First, Boston's complaint was dismissed at its own request. More importantly, *City of Boston's* holding as to the municipal cost recovery rule's inapplicability is less persuasive than the holdings are in *Board of Supervisors of Fairfax County, Virginia; City of Cincinnati* and *Penelas.*

>   FN23. 2000 WL 1473568 (Mass.Super.), *See also James v. Arcadia Machine &*

*Tool,* N.J.Super. No. ESX-L-6-59-99 (Dec. 11, 2001).

Like the Mayor and City here do, *City of Boston* observes that the major case precedents establishing and articulating the rule all stem from predictable, isolated events, such as fires, fuel spills, train derailments, airplane crashes, and so on. Responding to "such contingencies are part of the normal and expected costs of municipal existence," according to *City of Boston.* The handgun manufacturers, however, allegedly "engaged in a repeated course of conduct causing recurring costs to the municipality."

*City of Boston's* attempt to distinguish the damages there is a *non sequitur.* Moreover, it defies common sense to believe that emergency response to exploding trains and crashing airplanes is predictable, while emergency response to shootings is not. According to *City of Boston,* the police and fire services responding to a conflagration on a bridge after a pilot neglects to de-ice his airplane and set the flaps properly before taking off into a snow storm "can be expected." *City of Boston,* however, implies that emergency response after a murder or an accidental shooting is surprising. If the rule's applicability actually turned on the damages' predictability, it can be said that City's alleged damages resulting from handgun violence, such as increased overtime, are highly predictable and ordinary. They certainly are more predictable than the costs incurred by Flagstaff and the District of Columbia in the cases arising in those jurisdictions where municipal cost recovery was rejected.

Most significantly, *City of Boston* focuses on the tortfeasor's conduct, rather than on the damages' nature. The municipal cost recovery rule is not concerned about what the tortfeasor did. As explained above, the common law rule is grounded in the idea that the cost of municipal services must be carried by the public at-large and not by individuals, even tortfeasors. If the cost in question is for a municipal service, such as police work, it is not recoverable. As discussed above, the proffered damages all relate to typical emergency and police services, including overtime. Just as the public

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

2002 WL 31741522 (Del.Super.)

**(Cite as: 2002 WL 31741522 (Del.Super.))**

expects the fire department to respond to fires, the public expects the police and other emergency personnel to respond to shootings.

V.

As this decision's tone suggests, the court sympathizes with the Mayor's and the City's attempt to tackle the terrible threat posed by handguns to Wilmington's residents and visitors. If the court appreciates that handguns are a source of harmless recreation in the hands of law abiding enthusiasts and on rare occasions a means of self-defense, it also sees the torment and suffering caused daily by misused and arguably defective handguns. Handgun violence is a scourge. But as much as the court would support efforts to reduce the problem, the court will not twist a jury trial involving municipal costs into a wildy expensive referendum on handgun control. The Mayor and the City must find another means to their ends.

VI.

*8 For the foregoing reasons, Defendants' Motions for Summary Judgement based on Plaintiffs' inability to prove recognizable damages on their behalf is GRANTED.

IT IS SO ORDERED.

2002 WL 31741522 (Del.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that two copies of the attached pleading were electronically delivered to the following counsel on May 9, 2005.

Aaron R. Goldstein, Esquire
Deputy Attorney General
Carvel State Office Building
820 N. French Street
Wilmington, DE 19801

Eric Episcopo, Esquire
County Attorney
87 Reeds Way
New Castle, DE 19720

Robert J. Leoni, Esquire
Morgan, Shelsby & Leoni
131 Continental Drive, Suite 206
Newark, DE 19713

Ronald L. Stoner, Esquire
1107 Polly Drummond Plaza
Newark, DE 19711

_____ /s/ Melissa A. Chionchio _____
Melissa A. Chionchio
Secretary to Gary W. Aber, Esquire

20